[Cite as *State v. Bolan*, 2011-Ohio-4501.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 95807

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RAYMOND BOLAN

DEFENDANT-APPELLANT

---

### JUDGMENT:
### CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART AND
### REMANDED FOR RESENTENCING

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-531193

**BEFORE:**   Kilbane, A.J., Jones, J., and Keough, J.

**RELEASED AND JOURNALIZED:**   September 8, 2011

**ATTORNEYS FOR APPELLANT**

Steve W. Canfil
1370 Ontario Street
Standard Building
Suite 2000
Cleveland, Ohio 44113

Michael J. Cheselka, Jr.
Michael J. Cheselka, Jr., LLC
75 Public Square - Suite 920
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
Kevin R. Filiatraut
Brad S. Meyer
Assistant County Prosecutors
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, A.J.:

{¶ 1} Defendant-appellant, Raymond Bolan (Bolan), appeals his convictions and sentence. Finding merit to the appeal, we affirm his convictions, vacate his sentence in part, and remand for resentencing.

{¶ 2} In November 2009, Bolan was charged in a five-count indictment. Count 1 charged him with aggravated murder and carried a mass murder specification and one- and three-year firearm specifications.[1] Count 2 charged him with murder and carried a one- and three-year firearm specification. Count 3 charged him with felonious assault and carried a one- and three-year firearm specification. Count 4 charged him with attempted murder and carried a one- and three-year firearm specification. Count 5 charged him with felonious assault and carried a one- and three-year firearm specification. Counts 1-3 identify Jerome Fears (Fears) as the victim and Counts 4-5 identify Basheer Wheeler (Wheeler) as the victim. The matter proceeded to a jury trial, at which the following evidence was adduced.

{¶ 3} On November 4, 2008, Fears and Wheeler were walking on Central Avenue in Cleveland, Ohio. They were in the CMHA housing projects on

---

[1]The State dismissed the mass murder specification prior to trial.

their way to Wheeler's brother's house, when they encountered a group of males gathered on the sidewalk. Bolan, who was one of the males in the group, told Fears to "take off his hoodie. Nobody can be walking with hoodies around here." Fears took his hoodie off and continued walking with Wheeler. Bolan then asked the group of males, "who got a hammer?" One of the males gave Bolan a gun. Wheeler looked back twice and observed Bolan pointing the gun at him and Fears, while they continued walking. Bolan then fired the gun at them six times. Wheeler ran to his brother's house and did not see what happened to Fears, who was shot in the back and died on the scene. Wheeler testified that he has seen Bolan many times before, but did not know his name. He testified that he described the shooter to Fears's girlfriend, who told him "that's Ray Ray."

{¶ 4} Shortly thereafter, Cleveland and CMHA police officers arrived on the scene. Detective William Higginbottham (Higginbottham) of the CMHA Police Department testified that he responded to a call of shots fired in the 2700 block area of Central Avenue. A female on the scene advised Higginbottham that Wheeler was with Fears when the shooting occurred. She then took Higginbottham to see Wheeler. Higginbottham spoke with Wheeler and relayed this information to Detective Joselito Sandoval (Sandoval) of the Cleveland Police Department.

{¶ 5} Sandoval testified that he initially interviewed Wheeler in a

marked zone car on the night of the incident and took Wheeler's formal statement at the police station in December 2008. On the night of the incident, Wheeler told Sandoval that he did not know the names of any of the males in the group. He described the shooter as a black male in his mid to upper 20's, approximately 5'9", "thin build but cocky," wearing a white hoodie, blue jeans, and prescription glasses. At the station, he described the shooter as "a black male about 21 years old. He is about 5 foot 9 inches tall, and has a muscular build. He has a low haircut, and his face is clean shaven. I think he has tattoos on his arms, and wears prescription glasses every time I've seen him. He was wearing blue jeans, a pullover type white hoodie, with gold lettering on the front, and I think boots." Sandoval testified that Wheeler identified "Ray Ray" (Bolan) as the shooter from the photo array given to him.

{¶ 6} Helen Ogletree (Ogletree), who testified outside the presence of the public, stated that on the night of November 4, 2008, she heard gunshots, so she looked out her window and noticed someone laying on the ground. She then went outside and observed Fears's body on the ground and Bolan standing near him, with a gun in his hand. She also observed another unknown male standing with Bolan, but she did not know who he was. Ogletree further testified that she told Fears's girlfriend that Bolan killed Fears. Ogletree did not speak with the police on the night of the incident. During his investigation, Sandoval obtained Ogletree's name and contacted

her. Ogletree gave her statement to the police in July 2009. She described Bolan as "a black male, * * * in his 20s * * * big and husky and musclebound, like he just got out of the joint. He wears dark framed glasses and has brush waves in his short hair. He has a lot of tattoos on his arms and chest." Sandoval testified that Ogletree identified "Ray Ray" as the shooter from the photo array given to her.

{¶ 7} DNA testing on six shell casings found at the scene revealed a mixture of DNA, which meant that more than one person's DNA was on the casings. The DNA expert testified that "Bolan cannot be excluded as a possible contributor to the partial mixture profile obtained from [the shell casings.]"

{¶ 8} At the conclusion of trial, the jury found Bolan guilty of all charges and specifications. The court merged Counts 1, 2, and 3 for purposes of sentencing and sentenced Bolan to 30 years to life on Count 1. The court also merged the one- and three-year firearm specifications in Counts 1-5 and sentenced him to three years on the firearm specification to run consecutive and prior to Count 1. The trial court sentenced him to three years on each of Counts 4 and 5 and three years on each gun specification, to be served concurrent to each other and consecutive to Count 1 for an aggregate of 36 years to life in prison.

{¶ 9} Bolan now appeals, raising the following six assignments of error

for review.

ASSIGNMENT OF ERROR ONE

**"[Bolan] was denied his right to due process of law when the State presented insufficient evidence to support his convictions for aggravated murder (Fears) and attempted murder (Wheeler)."**

ASSIGNMENT OF ERROR TWO

**"[Bolan's] convictions were against the manifest weight of the evidence."**

ASSIGNMENT OF ERROR THREE

**"The trial court erred in failing to merge [Bolan's] convictions for attempted murder and felonious assault toward a single victim."**

ASSIGNMENT OF ERROR FOUR

**"In refusing to either secure the attendance of an essential defense witness or grant a reasonable continuance for this purpose, the trial court denied [Bolan's] right to a meaningful opportunity to present a complete defense, in violation of his rights to compulsory process, confrontation, due process, and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution and Article I of the Ohio Constitution."**

ASSIGNMENT OF ERROR FIVE

**"The trial court abused its discretion when it failed to grant [Bolan's] motion for new trial and failed to hold a requested hearing concerning newly discovered exculpatory evidence and failing to consider how the newly discovered evidence undermined confidence in the outcome of the trial."**

ASSIGNMENT OF ERROR SIX

**"The trial court denied [Bolan's] right to due process and confrontation when it excluded the public during testimony of key witnesses."**

<u>Sufficiency of the Evidence</u>

{¶ 10} In the first assignment of error, Bolan challenges the sufficiency of the evidence with respect to his aggravated murder and attempted murder convictions. He argues the State failed to prove that the shooting was the result of prior calculation and design. Rather, Bolan maintains that the shooting was a spur-of-the-moment act. He further argues there was no reliable evidence that anyone attempted to purposefully cause Wheeler's death.

{¶ 11} The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶113, explained the standard for sufficiency of the evidence as follows:

> "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing such a challenge, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560."

<u>Aggravated Murder</u>

{¶ 12} In the instant case, Bolan was convicted of the aggravated murder of Fears under R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" This statute was amended in 1973, because "'[b]y judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. * * * The section employs the phrase, "prior calculation and design," to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation.'" *State v. Hough*, Cuyahoga App. No. 91691, 2010-Ohio-2770, ¶13, quoting *State v. Keenan* (1998), 81 Ohio St.3d 133, 157, 689 N.E.2d 929.

{¶ 13} In *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶79, the Ohio Supreme Court noted that there is no bright-line rule to determine whether a defendant acted with prior calculation and design. The *Cassano* court acknowledged that "'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' * * * required under prior law." Id., quoting *State v. Cotton* (1978), 56 Ohio St.2d 8, 381 N.E.2d 190, paragraph one of the syllabus. Specifically, prior calculation and design requires "'a scheme designed to implement the calculated decision to

kill.'" *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, quoting *Cotton* at 11.

{¶ 14} The Ohio Supreme Court has stated the factors to consider in determining whether the defendant acted with prior calculation and design include: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost spontaneous eruption of events'?" *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, citing *State v. Jenkins* (1976), 48 Ohio App.2d 99, 255 N.E.2d 825. "These factors must be considered and weighed together and viewed under the totality of all circumstances of the homicide." *Jenkins* at 102.

{¶ 15} In the instant case, the record reveals that Bolan did not have a known relationship with Fears, and thus, they did not have a strained relationship. With respect to the second factor, the evidence demonstrates that Bolan gave thought in choosing the murder weapon by asking the other males in the group, "who got a hammer?" Wheeler testified that as he and Fears walked passed Bolan, Bolan told Fears to "take off his hoodie. Nobody can be walking with hoodies around here." Fears took off his hoodie and continued walking with Wheeler. Bolan then asked for a "hammer," which is a gun. This shows that Bolan was not carrying a gun and he made the

deliberate choice of asking for a gun to shoot Fears.

{¶ 16} With respect to the third factor, Bolan's actions went beyond a momentary impulse, showing that he had formulated a plan to kill. Wheeler testified that as he and Fears continued walking, he looked back twice and observed Bolan pointing the gun at them before he fired it. Wheeler testified that he and Fears were walking for a couple of minutes before Bolan fired the gun at them. Bolan argues the shooting was a spur-of-the-moment act.

{¶ 17} However, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 2001-Ohio-1340, 754 N.E.2d 1129. The Ohio Supreme Court held that one's actions could display a plan to kill. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996. In *Conway*, upon hearing that his brother had been stabbed, Conway retrieved a gun from his car and began shooting at the alleged perpetrator. The Court found that "[a]lthough they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action. Such facts show that he had adopted a plan to kill." Id. at ¶46, citing *State v. Claytor* (1991), 61 Ohio St.3d 234, 574 N.E.2d 472; *D'Ambrosio*.

{¶ 18} Thus, when viewed in a light most favorable to the State, the evidence was sufficient to show that Bolan adopted a plan to kill Fears upon

discovering that Fears was wearing a hoodie in his neighborhood and that Bolan had carried out his plan.

## Attempted Murder

{¶ 19} Bolan also argues that there is no reliable evidence that anyone was attempting to purposefully cause Wheeler's death during the incident.

{¶ 20} In order to convict a person of attempted murder, the State must prove that the defendant acted purposefully in attempting to take the life of another. R.C. 2903.02(A). "A jury may find intent to kill where the natural and probable consequence of a defendant's act is to produce death, and the jury may conclude from all of the surrounding circumstances that a defendant had a specific intention to kill." *State v. Brown*, Cuyahoga App. No. 92814, 2010-Ohio-661, ¶52, citing *State v. Clark* (1995), 101 Ohio App.3d 389, 405, 655 N.E.2d 795.

{¶ 21} In *Brown*, this court found sufficient evidence of attempted murder where the State presented evidence that Brown fired his gun at least five times at the victim and that the victim was hit by three of those five shots. In the instant case, Wheeler testified that Bolan fired the gun six times at him and Fears. Wheeler then ran away to his brother's home. As this court stated in *Brown*, "[a] natural and probable consequence of shooting at a person is that the person will be shot and killed." Id. Thus, we find sufficient evidence to sustain Bolan's conviction for attempted murder of Wheeler.

{¶ 22} Accordingly, the first assignment of error is overruled.

Manifest Weight of the Evidence

{¶ 23} In the second assignment of error, Bolan argues his convictions are against the manifest weight of the evidence.

{¶ 24} With regard to a manifest weight challenge, the "reviewing court asks whose evidence is more persuasive — the state's or the defendant's?    * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.'    [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652."    *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264,  ¶25.

{¶ 25} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"    *Thompkins* at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting *Martin*.

{¶ 26} Bolan does not challenge a specific conviction, rather he argues the jury lost its way in finding that he was the shooter.   He attacks the testimony of Wheeler and Ogletree, arguing they did not actually observe Bolan shoot the

gun.

{¶ 27} In the instant case, Wheeler identified Bolan in court as the person who shot at him and Fears. Wheeler testified that Bolan shot at them because Fears was wearing a hoodie. Wheeler testified that he has seen Bolan many times before, but did not know his name. He described the shooter to Fears's girlfriend, who told him "that's Ray Ray." On the night of the incident, Wheeler described the shooter as a black male in the mid to upper 20's, approximately 5'9", "thin build but cocky," wearing a white hoodie, blue jeans, and prescription glasses. When Wheeler met with Sandoval at the police station in December 2008, he described Bolan as "a black male about 21 years old. He is about 5 foot 9 inches, and has muscular build. He has a low haircut, and his face is clean shaven. I think he has tattoos on his arms, and wears prescription glasses every time I've seen him. He was wearing blue jeans, a pullover type white hoodie, with gold lettering on the front, and I think boots." Wheeler then identified Bolan as the shooter from the photo array given to him.

{¶ 28} Bolan attacks Ogletree's credibility because she testified that she is a "crackhead" and was incarcerated at the time of her testimony. We note that "'[t]he determination of weight and credibility of the evidence is for the trier of fact. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and

demeanor, and determine whether the witnesses' testimony is credible. As such, the trier of fact is free to believe or disbelieve all or any of the testimony. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility.'" (Citations omitted.) *State v. Montgomery*, Cuyahoga App. No. 95700, 2011-Ohio-3259, ¶10, quoting *State v. Blackman*, Cuyahoga App. No. 95168, 2011-Ohio-2262, ¶21.

{¶ 29} Upon review, we do not find that the jury clearly lost its way in assessing Ogletree's testimony. Ogletree testified that she was uncomfortable testifying because she feels like a "snitch." She did not receive a benefit for testifying and was bothered because her life is in danger "because somebody else killed somebody, and I opened my mouth." She admitted to being a "crackhead," but testified that her testimony is true. Ogletree testified that on the night of the incident she heard gunshots. She went outside and observed Fears's body on the ground. Bolan was standing near Fears with a gun in his hand. Ogletree described Bolan to the police as "a black male, * * * in his 20s * * * big and husky and musclebound, like he just got out of the joint. He wears dark framed glasses and has brush waves in his short hair. He has a lot of tattoos on his arms and chest." Ogletree identified Bolan as the shooter from the photo array given to her. She also

identified Bolan in court as the person she observed standing near Fear's body with a gun in his hand.

{¶ 30} Furthermore, DNA testing on six shell casings found at the scene revealed that "Bolan cannot be excluded as a possible contributor to the partial mixture profile obtained from [the shell casings.]"  Additionally, the physical evidence revealed that Fears was shot in the back at a distance of over four to five feet.

{¶ 31} Based on the foregoing, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that Bolan's convictions must be reversed and a new trial ordered.  *Martin* at 175.

{¶ 32} Therefore, the second assignment of error is overruled.

<u>Merger</u>

{¶ 33} In the third assignment of error, Bolan argues the trial court erred by failing to merge the attempted murder (Count 4) and felonious assault (Count 5) charges.  The State concedes this argument, and we agree.

{¶ 34} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court redefined the test for determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25.[2]  The *Johnson* court expressly overruled *State v. Rance*,

_____

[2]R.C. 2941.25 governs allied offenses and provides:

85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699, which required a "comparison of the statutory elements in the abstract" to determine whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other.

{¶ 35} The *Johnson* court held that rather than compare the elements of the crimes in the abstract, courts must consider the defendant's conduct. Id. at syllabus. The court found:

> **"In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * ***
>
> **If multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' [*State*] *v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶50, (Lanzinger, J., dissenting).**
>
> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**

---

> **"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
>
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."**

**Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge."** Id. at ¶48-50.

{¶ 36} The Ohio Supreme Court recently held that the failure to merge allied offenses of similar import constitutes plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

{¶ 37} In the instant case, the State conceded at sentencing that Counts 1-3 merged and elected to proceed with Count 1. The State did not believe that Counts 4 and 5 merged, and left the issue of merger to the discretion of the trial court. The trial court sentenced Bolan to three years on Count 4 (attempted murder) and three years and on Count 5 (felonious assault), to be served concurrent to each other.

{¶ 38} R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another[.]" R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]" Bolan's conduct of shooting a gun at Wheeler while he was walking, could result in the commission of attempted murder and

felonious assault under these respective statutes. This evidence demonstrates that the charges arose from the same conduct and that Bolan committed the attempted murder and felonious assault of Wheeler with a single animus. Therefore, the attempted murder (Count 4) and the felonious assault (Count 5) charges should be merged into a single count for sentencing.

{¶ 39} Accordingly, the third assignment of error is sustained. We vacate his sentences on both Count 4 and Count 5, and remand the matter for a sentencing hearing, at which the State will elect which allied offense it will pursue against Bolan. See *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶24-25.

Motion for Continuance

{¶ 40} In the fourth assignment of error, Bolan argues the trial court violated his right to present a meaningful trial by refusing to grant a continuance when Carlyeliea Benson (Benson) failed to appear in court to testify for the defense. "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. [Therefore, an] appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 423 N.E.2d 1078, citing *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921; *State v. Bayless* (1976), 48 Ohio St.2d 73, 101, 357 N.E.2d 1035. An abuse of discretion "'implies that the court's

attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.

{¶ 41} Relevant factors to be considered when determining whether a continuance should have been granted include the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors. *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.

{¶ 42} In the instant case, Bolan wanted to call Benson as a defense witness on August 27, 2010. At that time, defense counsel advised the court that Benson was not in court. Defense counsel asked the court for a bench warrant and "a recess until [defense counsel is] allowed to bring [Benson] in." The trial court issued the bench warrant and noted for the record that it offered to issue a bench warrant for Benson the day before, but defense counsel declined it. The State noted on the record that its attempts to get Benson to appear in court were unsuccessful. The trial court denied Bolan's motion for continuance. Defense counsel then moved for a mistrial, which the trial court denied. After a sidebar was held, the trial court then granted Bolan a one-hour continuance (until 11:55 a.m.) for the defense to act on the bench warrant issued by the court.

{¶ 43} The court reconvened an hour and ten minutes later and Benson

was not in court. At sidebar, defense counsel stated that he wanted to rest, subject to the admission of the defense exhibits. Defense counsel wanted to admit the police report summarizing Benson's statement, which defense counsel claimed is exculpatory.

{¶ 44} The court then took another recess, at which point defense counsel advised that "pursuant to the bench warrant that this Court issued earlier this morning, my call with police dispatch indicates that they have nothing in writing. They have located Miss Benson, but without something being faxed over to them, they claim to not have the authority to pick her up. * * * [I]f something got faxed over to the police, it's my understanding that they would pick her up and probably be able to bring her in before lunch is over." Defense counsel continued to state that he "just found this out" and it was handed to him "[t]wo minutes ago." The trial court then faxed the bench warrant to the number provided by defense counsel.

{¶ 45} At 1:00 p.m., the trial court resumed, and Benson was still not present. When the trial court asked defense counsel if the police have Benson, counsel replied, "I've gotten two conflicting reports." Defense counsel then stated that he has "not spoken to law enforcement" nor police dispatch despite previously advising the court that the police had located Benson and advising the court bailiff that "[Benson] had gotten into her car and was on her way here."

{¶ 46} The trial court then correctly noted that "the bench warrant was requested late this morning, a day after it was known that [Benson's appearance] was problematic because she didn't show yesterday pursuant to a subpoena as was brought to the Court's attention. * * * At 9:00 today, according to what counsel has said, again, her appearance appeared to be problematic and it was not until after 10:00 that the request for a bench warrant was made when the jury was already here and we were ready to work. There was a one hour request for a recess. That was granted. Then this thing about the police had located [Benson] when defense counsel never did speak to the police saying that they had her. Then telling my bailiff that she was going to appear voluntarily, and now its 22 minutes after 1:00."

{¶ 47} Under these circumstances, we do not find that the denial of a continuance amounted to an abuse of discretion by the trial court.

{¶ 48} Accordingly, the fourth assignment of error is overruled.

<u>Motion for New Trial</u>

{¶ 49} In the fifth assignment of error, Bolan argues the trial court erred when it denied his motion for a new trial based on newly discovered evidence.

{¶ 50} A motion for a new trial is addressed to the sound discretion of the trial court, and the court's ruling on the motion will not be disturbed on appeal absent an abuse of discretion. *State v. Matthews*, 81 Ohio St.3d 375, 378, 1998-Ohio-433, 691 N.E.2d 1041, citing *State v. Schiebel* (1990), 55 Ohio St.3d

71, 564 N.E.2d 54, paragraph one of the syllabus.

{¶ 51} To warrant the granting of a new trial on the grounds of newly discovered evidence, "'it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'" *State v. Barnes*, Cuyahoga App. No. 95557, 2011-Ohio-2917, ¶23, quoting *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370, at the syllabus.

{¶ 52} Crim.R. 33(A)(6) provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:   [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.   When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion * * * the affidavits of the witnesses by whom such evidence is expected to be given * * *.   The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses."   "While the language of the rule contemplates an evidentiary hearing to consider newly discovered evidence, such a hearing is discretionary and not mandatory."

*Bedford v. Edwards*, Cuyahoga App. No. 94532, 2011-Ohio-91, ¶10, citing *State v. Stewart*, Cuyahoga App. No. 83428, 2004-Ohio-4073.

**{¶ 53}** In moving for a new trial, Bolan submitted Benson's statement, which identified the shooter as "Ray Ray" and described him as 5'6" to 5'7", skinny build, with bricks tatooed on his right arm. Also attached to his motion, was a letter dated September 1, 2010, from the prosecutor addressed to defense counsel.[3] In that letter, the prosecutor states that Benson gave her statement to the police on June 20, 2010. The letter indicates that her statement was taken by a detective who was not assigned to the case, and thus she was not shown any photo arrays to determine Bolan's identity. On either August 24 or August 25, 2010, the prosecutor gave defense counsel's assistant Benson's most recent address so counsel could serve her with a subpoena to testify in the case. The prosecutor also called Benson on August 24 and August 25, 2010, and left Benson messages to come to court.

**{¶ 54}** Later in the day on August 27, 2010, Benson called the prosecutor, stating that "she had been chased all over town by several relatives of the person who was on trial, and had dropped her phone, and was scared. She stated that at least one of the people chasing her had a gun." Benson refused to give her whereabouts, and did not come in, even after being advised there

---

[3]The jury returned its verdict on August 27, 2010.

was an active bench warrant issued for her by the trial judge. Then on Sunday, August 29, 2010, Benson called the prosecutor stating that she would come in voluntarily on Monday to take care of the bench warrant and that "the person we went to trial against was not the shooter in the case, and in fact, the shooter was one of the people chasing her on Friday, with a gun."

{¶ 55} We recognize that "[b]efore a trial court may grant a motion for a new trial on the grounds that a witness has recanted his testimony, a trial court must determine whether the statements of the recanting witness are credible and true. Newly discovered evidence recanting testimony is 'looked upon with the utmost suspicion.' The court is to ascertain the credibility of the witness. Thus, a motion for a new trial that is based on recanted testimony is to be granted only when the court is reasonably satisfied that the trial testimony given by a material witness was false." (Internal citations omitted.) *State v. Braun*, Cuyahoga App. No. 95271, 2011-Ohio-1688, ¶39.

{¶ 56} In the instant case, Bolan failed to provide credible evidence to warrant a new trial. Both Ogletree and Wheeler identified Bolan as the shooter. Benson's statement only changed after she notified the State that she was scared because she had been chased all over town by several of Bolan's relatives, one of which had a gun. This new evidence lacks credibility because it demonstrates that Benson was coerced. Evidence of witness intimidation was further supported by Arthur Smiley's (Smiley) recantation. Smiley who

witnessed the shooting, stated to the police that "Ray Ray" was the shooter and identified Bolan as the shooter from a photo array. Smiley then changed his statement after being in the same holding cell as Bolan. Smiley signed a letter stating that he did not see what happened and that he made up the accusations against Bolan. Accordingly, the trial court did not abuse its discretion when it denied Bolan's motion for a new trial without conducting a hearing.

{¶ 57} Thus, the fifth assignment of error is overruled.

## Right to Public Trial

{¶ 58} In the sixth assignment of error, Bolan argues the trial court denied his right to public trial by closing the courtroom during the testimony of Ogletree and Smiley. He argues the trial court did not place any particular reasons on the record justifying the closure. He further argues that the court abused its discretion when it ordered him to refrain from looking at Ogletree while she testified.

{¶ 59} "The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 49. Public trials ensure that the judges and prosecutors carry out their duties responsibly, encourage witnesses to come forward, and discourage perjury. *Waller v. Georgia* (1984), 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31, citing *In re Oliver* (1948), 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682. "The violation of the right to a public trial is structural error [that affects the framework of trial] and not subject to harmless-error analysis." *Drummond* at ¶ 50.

{¶ 60} We note that "[t]he right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings." Id. at ¶51. Thus, we review the trial court's decision to remove the public from a courtroom under an abuse of discretion standard of review. Id. at ¶58; *State v. Brown* (Nov. 25, 1998), Cuyahoga App. No. 73060.

{¶ 61} In *Waller*, the seminal case regarding the right to a public trial, the trial court closed a suppression hearing to all persons other than witnesses, court personnel, the parties, and counsel. The United States Supreme Court set forth the following four-pronged test that courts must use to determine whether closure of a courtroom is necessary:

"[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." *Waller* at 48.

{¶ 62} In the instant case, the trial court ordered that all spectators be removed from the courtroom during the testimony of Ogletree and Smiley. The State requested that the courtroom be cleared of all spectators during Ogletree's testimony. When discussing the State's request with the trial court, defense counsel stated that he did not "believe [the closure of the courtroom] presents any prejudice to [Bolan.] * * * The only logistical problem [defense counsel] would see * * * is that [Ogletree] then be called to testify after the course of a normal break, so as to effect having the courtroom cleared, before the jury returns to this courtroom." The trial court responded, "[t]hat could be accommodated. We can do it after a break. If we do, would that mean that you waive any prejudice by the courtroom being emptied at the time [Ogletree] is testifying?" Defense counsel replied, "[a]bsolutely." Then prior to Ogletree's testimony, the trial court stated that it does not "want [Bolan's] gaze directed at [Ogletree] at all. If there is, there will be some sort of sanctions."

{¶ 63} With respect to Smiley, defense counsel requested the trial court close the courtroom during the hearing determining whether Smiley would testify. Defense counsel stated, "I would ask this Court to please have the courtroom cleared for this proceeding * * * it's been demonstrated in this trial that people in the neighborhood and associated with either

family in this case have had a reluctance to be candid with witnesses, whether for admitting different stories, or for fear of retribution. Whatever the issues are, I just think it would be clearer if there wasn't anybody involved except those people that have to be." The State did not object, and the trial court granted the motion.

{¶ 64} In *Drummond*, the Ohio Supreme Court reviewed two closures by the trial court. In applying the *Waller* factors to the first closure, the *Drummond* court found that all four factors were satisfied and the trial court did not abuse its discretion in ordering the limited closure of the courtroom. Id. at ¶58. However, with respect to the second closure, the *Drummond* court noted that "the defense did not object to the trial court's action. Defense counsel were present during the entire proceedings and were fully aware of the exclusion of the spectators from the courtroom." Id. at ¶59. Thus, the court held that defense "counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial during [the witness's] testimony. See *Peretz v. United States* (1991), 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808, citing *Levine v. United States* (1960), 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989." Id.

{¶ 65} Here, just as in *Drummond*, the defense did not object to the closure of the courtroom. With respect to Ogletree, defense counsel consented to the closure and acknowledged that Bolan waived any prejudice by the courtroom being emptied at the time Ogletree testified. With Smiley, defense counsel requested that the courtroom be closed

during his testimony. The State did not object, and the trial court granted the request. "Such circumstances dispel any reasonable claim of prejudice to this defendant and strongly indicate that this order was made for the benefit of the defense and with its active support." *Bayless* at 110. Thus, defense counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial during Ogletree's and Smiley's testimony.

{¶ 66} Based on the foregoing, we conclude that Bolan's Sixth Amendment right to a public trial was not violated.

{¶ 67} Accordingly, the sixth assignment of error is overruled.

{¶ 68} Thus, Bolan's convictions are affirmed, his sentence is vacated in part, and this case is remanded for further proceedings on merger of allied offenses and resentencing.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

LARRY A. JONES, J., and
KATHLEEN ANN KEOUGH, J., CONCUR