[Cite as *State v. Burkes*, 2018-Ohio-4854.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106412**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**JERMAINE BURKES**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-612201-A

**BEFORE:** McCormack, J., E.A. Gallagher, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** December 6, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Maxwell Martin
Jeffrey M. Maver
Fallon Radigan
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113


TIM McCORMACK, J.:

{¶1}   Defendant-appellant Jermaine Burkes appeals his conviction for aggravated murder, murder, felonious assault, and having weapons while under disability.   For the reasons that follow, we affirm.

## Procedural History

{¶2}   On December 20, 2016, Burkes was indicted on five counts relating to the death of Nakika Burston ("Nakika" or "the victim"):   aggravated murder in violation of R.C. 2903.01(A); murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); felonious assault in violation of R.C. 2903.11(A)(2); and having weapons while under disability in violation of R.C. 2923.13(A).   The first four counts contained one- and three-year firearm specifications.   On August 21, 2017, a jury found Burkes guilty on all counts.

**{¶3}** On October 3, 2017, the court held a sentencing hearing, during which the parties agreed that Counts 1 through 4 merged for sentencing, and the state elected to sentence on Count 1. Thereafter, the court sentenced Burkes to 30 years to life on Count 1, aggravated murder, plus three years on the firearm specification, to be served consecutively. The court imposed a sentence of 36 months on Count 5, having weapons while under disability, to be served concurrently to Count 1. The aggregate sentence is 33 years in prison.

**{¶4}** Burkes timely appealed his conviction, raising five assignments of error.

Substantive Facts

**{¶5}** Burkes's convictions stem from an incident that occurred at the home of Keyona Humphrey ("Keyona"), with whom Burkes was long-acquainted.[1] At the time of the incident, Keyona was dating the victim, Nakika Burston, who lived with Keyona and their children.

**{¶6}** Keyona testified that Burkes and the victim had known each other for a very long time as well, having grown up together. Burkes and the victim would get together on occasion, and Burkes would visit with Keyona and her children at their home. Keyona stated that Burkes would sleep at the house "most nights."

**{¶7}** Keyona also testified that she had another brother named Deonte, whom everyone called "Don Juan."[2] Deonte would visit Keyona at her place usually every other day, and the last day she saw him there was approximately two days prior to the incident in question. At this time, Deonte and Burkes "had words" about Deonte's cell phone. Keyona stated that Deonte

---

[1] Although not blood-related, Keyona testified that she regarded Burkes as her brother, as they have known each other since they were children and Burkes's mother and Keyona's father had been in a relationship.

[2] There is some testimony that Deonte is the victim's brother.

accused Burkes of stealing Deonte's phone, but Burkes replied that he did not have it. According to Keyona, "they went back and forth" with words, but there was no fighting. Burkes, however, "pulled a knife on Deonte and that was it."

{¶8} Keyona testified that during the early morning hours of December 4, 2016, the victim came home and went upstairs to see Keyona in her bedroom. He seemed upset, and he told Keyona that he was leaving but would return home at 6:00 a.m. and that Keyona should lock the door. The victim left, and Keyona fell asleep. She awoke around 7:00 a.m. to use the bathroom and discovered the victim, fully clothed, asleep in her bed along with their daughter. Just as she had returned to her bed and closed her eyes, Burkes appeared at her bedroom door, with a silver gun in his hand. He was standing in the hallway knocking on the door, waving the gun, and calling out to the victim, "Get your a** up, B****, I'm about to kill you." Keyona stated that Burkes seemed angry and he was talking loudly, "sound[ing] like he wanted to fight. He wasn't calm." She told him to leave because he had a gun.

{¶9} Keyona testified that Burkes then made his way down the stairs and to the "kitchen side" of the house. She followed him down the stairs, and by the time she made it downstairs, Burkes was standing in front of the open screen door, near the porch. Burkes was yelling, "Bring that b**** down here, I'm about to kill you, B****. I'm tired of you, over your $5. Give me your $5. * * * B****, I'll press charges and I'm about to kill you. * * * You trying to play me over $5." Keyona closed the screen door, and Burkes walked away and sat in the courtyard of the apartment complex.

{¶10} At some point while Burkes was yelling, the victim had come down the stairs and stood behind Keyona, who was standing in the doorway. The men exchanged words, and as the heated exchange continued, the victim opened the screen door, proceeded outside, and stood on

the porch, where he remained. Keyona remained in the doorway. Keyona testified that Burkes then "walked up [and] fired" once at the victim, hitting him in the chest. The victim declared, "That b**** just shot me," and he pulled his shirt up showing Keyona the bullet hole in his shirt. The victim made his way back into the kitchen of the apartment where he collapsed.

{¶11} Keyona then phoned 911 and checked for the victim's pulse, which was "barely there." Keyona stated that she no longer saw Burkes outside. She ran to a neighbor's place, telling the neighbor that Burkes just shot the victim. The police and paramedics arrived. Keyona gave the police a description of Burkes and the paramedics removed the victim from the home.

{¶12} Dr. Thomas Gilson, of the Cuyahoga County Medical Examiner's office, testified that the victim died from a single gunshot wound to the trunk (chest). He also testified that the victim was at least two feet away from the gun when he was shot.

{¶13} Richard Shelton, Keyona's neighbor, had known the victim for at least ten years, and he knew Burkes from being in the neighborhood. Shelton testified that on December 4, 2016, as he was walking home from the nearby supermarket, he heard arguing and looked around the corner. He saw Burkes and heard him yelling, "I'm going to kill you." Just as Shelton turned to walk home, he heard a gunshot and saw Burkes running around the end of the building. Shelton stated that at the time he heard the gunshot, he and Burkes were the only people outside. According to Shelton, Keyona then came out of her home and told him that Burkes shot the victim. Shelton went to Keyona's home and saw the victim lying on the kitchen floor. Shelton further testified that prior to the shooting, he had last seen Burkes one day earlier,

"walking around in a daze, smoking that water."[3]   He stated that he had not witnessed any altercation between Burkes and Deonte in the days prior to the shooting.

{¶14} Cleveland police officer Andrea Feldman and her partner responded to an early morning call about a felonious assault by a male suspect.   The suspect, later identified as Burkes, was located nearby.   The officers discovered a firearm on Burkes and placed him in their patrol car.   Officer Feldman testified that while in the back of the patrol car, Burkes made certain statements, such as, "I only shot once and I ran," "it's [my] sister's baby daddy," and "I didn't mean to do it."   Officer Feldman stated that Burkes kept repeating himself.

{¶15} Cleveland police detectives Ray Diaz and Jody Remington were assigned to investigate the shooting.   They collected evidence and interviewed witnesses and Burke.   The detectives testified that Burkes admitted to shooting the victim, stating, "I guess I killed him.   I didn't meant to do it.   I only shot once."

{¶16}   According to Detective Diaz, Burkes told the detectives that he was a victim of a robbery the evening before the shooting and Burkes was treated at the hospital for injuries that occurred during the robbery.   Burkes filed a police report for the robbery, naming Nakika as the suspect.   Burkes explained that Nakika and Deonte had "jumped" Burkes, beat him up, and took $600 from him. Burkes was very angry about it.   Burkes told the detectives that he was upset with Nakika's treatment of Keyona and his failure to support Keyona and their children.   Burkes also told the detectives that after Nakika and Deonte   jumped him, Burkes and his cousin picked up a "little a** gun" and drove to Keyona's place where they were going to "jump" Nakika because Burkes wanted his "stuff" back.   Burkes said that when he arrived at Keyona's place, he kept telling Nakika to come outside, but he refused to leave the house.   When the victim did

---

[3]   "Water" is a reference to the drug, PCP.

eventually come to the door, Burkes told the detectives that he said to Nakika, "come out here and get you're a\*\* beat." When Nakika did not go outside, Burkes "snapped" and fired a shot at the victim.

{¶17} Alicia Burkes, the defendant's sister, testified that she received a letter from Burkes while he was in jail awaiting trial. She testified that in this letter, Burkes acknowledged that he "murdered a man," he was "sorry for that," and he wished he could "take it back."

{¶18} Burkes testified on his own behalf. He stated that a couple of days before the shooting, Deonte and the victim accused Burkes of stealing Deonte's cell phone, they assaulted him with a satellite cable, and they took $600 from him. Burkes stated that he was injured and he went to the hospital to receive treatment for his injuries. After receiving treatment, Burkes left the hospital. He was "mad and angry" at Deonte and the victim "[b]ecause they just jumped on me and put me in the hospital."

{¶19} After leaving the hospital, he went to Keyona's house because he "stays there" and he "[had] nowhere else to go." He stated that he did not expect to find the victim there, but upon entering the home, he found the door open. He grabbed the gun he had placed in the pantry days before and proceeded up the stairs to Keyona's bedroom. Burkes testified that he was holding onto the gun for his cousin. According to Burkes, when he entered Keyona's bedroom, the victim "jumped up" and threatened him. Burkes stated that he then told the victim to go outside, and Burkes ran downstairs and outside and he slammed the door. On cross-examination, Burkes conceded that he did in fact tell the police that he planned to "jump" Nakika but claimed he was confused, stating that "this whole thing is a big f\*\*\*up."

{¶20} Burkes testified that he waited approximately 10 to 15 minutes outside for the victim, because perhaps "he had to put on his pants." Burkes stated that he "was so mad that

[Deonte and the victim] had jumped on me the night before * * * and [they] still want to hurt me for something I [didn't] do, [they] still want to try to hurt me after [they] beat me up and took my money."

{¶21} When Burkes was outside waiting, he drew his gun and he heard his niece say, "Mommy, the man got a gun in his hand" and "Here come [the victim]." When the victim came out onto the porch, Burkes turned and fired a shot at the victim. Burkes denied threatening the victim. He testified, rather, that he feared for his life and he "snapped." Burkes stated that he was holding onto the gun for his cousin and he did not mean to hurt anyone. However, Burkes testified that he knew Deonte and the victim would jump him again.

## Assignments of Error

I. The trial court erred by denying Appellant's request for a jury instruction on the inferior degree offense of voluntary manslaughter in violation of Appellant's Constitutional Rights to Due Process and a Fair Trial.

II. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

III. The convictions were against the manifest weight of the evidence.

IV. The trial court erred by denying Appellant's Batson challenge.

V. Appellant's sentence is clearly and convincingly not supported by the record and is contrary to law.

## Jury Instruction

{¶22} In his first assignment of error, Burkes alleges the trial court erred by denying his request for a jury instruction on voluntary manslaughter. Burkes argues that he presented sufficient evidence that he was acting under the provocation necessary to warrant a voluntary manslaughter instruction.

**{¶23}** We review a trial court's refusal to give a requested jury instruction for an abuse of discretion. *State v. Williamson*, 8th Dist. Cuyahoga No. 95732, 2011-Ohio-4095, ¶ 36, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

**{¶24}** A trial court must charge on a lesser included or inferior offense "where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included or inferior offense." *State v. Carter*, 8th Dist. Cuyahoga No. 106462, 2018-Ohio-3671, ¶ 59, citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. In determining whether the instruction is warranted, the trial court views the evidence in the light most favorable to the defendant. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37. The lesser included or inferior offense instruction is not warranted every time "some evidence" is presented to support the lesser offense. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Rather, a court must find sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser included or inferior offense. *Carter*, citing *Shane* at 632-633.

**{¶25}** Voluntary manslaughter is an inferior degree of aggravated murder, as "'its elements are contained within the indicted offense, except for one or more additional mitigating elements.'" *State v. Tyler*, 50 Ohio St.3d 24, 36, 553 N.E.2d 576 (1990), quoting *State v. Deem*, 40 Ohio St.3d 205, 209, 533 N.E.2d 294 (1988). Voluntary manslaughter consists of knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force * * *." R.C. 2903.03(A).

{¶26} Whether the provocation was reasonably sufficient to prompt sudden passion or a sudden fit of rage involves both an objective and a subjective analysis. *Shane* at 634. For the objective standard, the alleged provocation by the victim must be reasonably sufficient to incite deadly force, meaning "it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 635. For the subjective standard, the defendant in the particular case must have actually acted under the influence of sudden passion or in a sudden fit of rage. *Id.* at 634-635. The subjective component, the "emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time," will only be considered if the defendant has satisfied the objective component. *Id.*

{¶27} The determination of what is reasonable provocation is a question of fact for the factfinder. *State v. Roberts*, 8th Dist. Cuyahoga No. 90998, 2009-Ohio-1605, ¶ 22, citing *Shane,* 63 Ohio St.3d 630, 632, 590 N.E.2d 272. The standard of what constitutes adequate provocation is "that provocation which would cause a reasonable person to act out of passion rather than reason." *Shane* at 634, fn. 2. And when, as a matter of law, no reasonable jury could find that the provocation was adequate, the judge may refuse to give a voluntary manslaughter instruction. *Id.*; *State v. Lee*, 10th Dist. Franklin No. 17AP-908, 2018-Ohio-3957, ¶ 49.

{¶28} Ohio courts have held that for purposes of voluntary manslaughter, words alone will not generally constitute reasonably sufficient provocation. *Shane* at 637; *Carter*, 8th Dist. Cuyahoga No. 106462, 2018-Ohio-367, at ¶ 63; *Lee* at ¶ 53; *State v. Teets*, 4th Dist. Pickaway No. 16CA3, 2017-Ohio-7372, ¶ 63. Similarly, fear alone is insufficient support for reasonable provocation. *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998); *State v. Sinclair*, 8th Dist. Cuyahoga No. 105726, 2018-Ohio-3363, ¶ 45; *State v. Harris*, 129 Ohio App.3d 527,

535, 718 N.E.2d 488 (10th Dist.1998). Moreover, "past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." *Mack* at 201; *State v. Hunter*, 9th Dist. Summit No. 28484, 2018-Ohio-568, ¶ 8. A "cooling off" period is "a very short time span." *State v. Gillespie*, 3d Dist. Paulding No. 11-16-07, 2017-Ohio-6936, ¶ 44.

{¶29} Burkes contends that he was sufficiently provoked by the victim to warrant a voluntary manslaughter instruction. In support, he asserts that the victim assaulted and robbed him the night before the shooting, and when Burkes was in Keyona's home the next day, the victim threatened him. Burkes also states that he had been traumatized by witnessing the death of his mother and the suicide of his cousin, and when the court considers his emotional and mental state, along with the circumstances of the shooting, an instruction on voluntary manslaughter is proper. We find Burkes's argument unpersuasive.

{¶30} An assault on an individual can arguably constitute sufficient provocation to arouse a defendant into using deadly force. *See Shane*, 63 Ohio St.3d at 635, 590 N.E.2d 272 ("classic" voluntary manslaughter situations include assault and battery, mutual combat, illegal arrest, spousal adultery). However, as noted, past incidents or threats cannot be considered reasonably sufficient provocation when there is sufficient time for cooling off. *Mack* at 201; *Hunter* at ¶ 8. And as courts have held, a "cooling off" period can be a very short time. *Gillespie* at ¶ 44 (two-week time period between the allegedly provoking incident and the victim's murder sufficient cooling off to find voluntary manslaughter instruction not appropriate); *State v. Glenn*, 2d Dist. Montgomery No. 27639, 2018-Ohio-2326, ¶ 26 (cooling off period of several minutes between the time the defendant was told to leave the bar and the time of the shooting precluded the jury instructions related to voluntary manslaughter); *State v.*

*Stanley*, 7th Dist. Mahoning No. 14 MA 0106, 2016-Ohio-7284, ¶ 24 (the time it took for the defendant to leave in his car, apparently obtain his gun, and then return to the business 3-5 minutes later was a sufficient cooling off period to prevent voluntary manslaughter instructions); *State v. Townsend*, 7th Dist. Mahoning No. 04 MA 110, 2005-Ohio-6945 (the time it takes for a person to drive home and retrieve a weapon constitutes a sufficient cooling off period); *State v. Byerly*, 5th Dist. Richland No. 02-CA-81, 2003-Ohio-6911 (the time it takes for a person to walk one-half mile home is enough for a cooling off period).

{¶31} Here, Burkes contends that the victim assaulted and robbed him the night before, resulting in Burkes's need for medical treatment. According to Burkes, he obtained a ride to Keyona's home the next morning where he unexpectedly found the victim and shot him. This passage of time between the alleged assault the night before, which was purportedly the incident that caused Burkes to be enraged, and the shooting the next morning "renders the 'sudden passion' element of voluntary manslaughter insufficient as a matter of law." *State v. Shakoor*, 7th Dist. Mahoning No. 01 CA 121, 2003-Ohio-5140, ¶ 103; *Stanley* at ¶ 24.

{¶32} In order to find provocation, then, Burkes would have to demonstrate that some further exchange occurred after Burkes entered Keyona's home. Burkes alleges that the victim threatened him when he entered the home. We note however that Keyona testified that Burkes approached the victim, waving a gun and threatening him. Regardless, even if we believe Burkes's version of the facts, Burkes's own testimony is that he ran downstairs and out of the house when the victim threatened him, and he waited for the victim for 10 to 15 minutes. This lapse of time between the alleged threat and the shooting enabled Burkes to "cool off." Therefore, as a matter of law, Burkes cannot establish "sudden passion" or a "sudden fit of rage" required for voluntary manslaughter.

**{¶33}** Viewing the evidence in a light most favorable to Burkes, we find there was insufficient evidence that Burkes was acting under the influence of sudden passion or in a sudden fit of rage to warrant jury instructions on voluntary manslaughter.

**{¶34}** Burkes's first assignment of error is overruled.

### Sufficiency of the Evidence

**{¶35}** In his second assignment of error, Burkes contends that the court erred when it denied his Crim.R. 29(A) motion for acquittal on Counts 1 through 4.

**{¶36}** A Crim.R. 29(A) motion challenges the sufficiency of the evidence. When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**{¶37}** Burkes argues that the state failed to present sufficient evidence of prior calculation and design to sustain his conviction for aggravated murder.

**{¶38}** R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A).

**{¶39}** "Prior calculation and design" indicates "'studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). The scheme must be "designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Prior calculation and design can be found even when a plan to kill is quickly conceived and executed within minutes. *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001). A momentary impulse, however, is insufficient. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996.

**{¶40}** The existence of prior calculation and design is determined on a case-by-case analysis of the facts and the evidence. *Hill* at ¶ 21, citing *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). The facts of a particular case can demonstrate that the defendant had adopted a plan to kill. *Conway* at ¶ 46.

**{¶41}** In determining whether a defendant acted with prior calculation and design, the Ohio Supreme Court has delineated three factors a court should consider: "(1) Did the accused and victim know each other, and if so, was that relationship strained; (2) Did the accused give thought or preparation to choosing the murder weapon or murder site; and (3) Was the act drawn out or 'an almost spontaneous eruption of events?'" *State v. Bolan*, 8th Dist. Cuyahoga No. 95807, 2011-Ohio-4501, ¶ 14; *Taylor* at 19; *State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825 (8th Dist.1976). These factors "must be weighed together and viewed under the totality of all circumstances of the homicide." *Jenkins* at 102.

**{¶42}** We find that construing the evidence in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Burkes formulated

a plan to kill the victim. Burkes and the victim knew each other and evidently had a very strained relationship. Burkes claimed that the victim had jumped him, beat him up, and stole $600 from him. Burkes was angry about the alleged incident. Sometime shortly after the incident, Burkes acquired a gun and he obtained a ride to the house where he knows the victim stays. He proceeded directly up the stairs to the bedroom where the victim was asleep, carrying the gun. When he arrived upstairs, he waved the gun around and he yelled loudly to the victim, "Get you're a\*\* up, B\*\*\*\*, I'm about to kill you." The fact that Burkes did not shoot the victim immediately upon finding him upstairs does not negate his intention to kill the victim. Rather, the evidence shows that Keyona made Burkes leave because he had a gun and Keyona's daughter was asleep in the bed with the victim. Burkes went outside and waited for the victim. And when the victim did wake, go downstairs, and open the screen door, stepping onto the porch, Burkes turned, or "walked up," and shot the victim.

{¶43} The foregoing evidence indicates that Burkes had orchestrated a plan to kill the victim. The evidence does not demonstrate a sudden eruption of events. Accordingly, we find that a rational trier of fact may infer prior calculation and design beyond a reasonable doubt.

{¶44} Burkes also argues that the state failed to present evidence that he knowingly caused physical harm or serious physical harm to the victim sufficient to sustain his convictions for murder and felonious assault.

{¶45} Under R.C. 2903.02(B), "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." In this case, the underlying felony is the felonious assault against Nakika.

**{¶46}** Under R.C. 2903.11(A)(1), felonious assault, "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶47}** A firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce serious injury or death. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 25, citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). Moreover, "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989).

**{¶48}** Here, Burkes used a gun to force the victim out of his bed and his home, and he fired the gun at the victim. He threatened the victim with the words, "I'm going to kill you." And by shooting at the victim, Burkes fully carried out his threat. The fact that Burkes later claimed he did not intend to kill the victim does not remove the inference that he acted knowingly when he shot the gun in a place where not only the victim was standing, but where Burkes's sister had also been standing nearby. Moreover, as Burkes testified that he had previously been shot in the stomach, he has personal knowledge that a gunshot will probably cause serious injury.

**{¶49}** Burkes's second assignment of error is overruled.

Manifest Weight

**{¶50}** Burkes contends in his third assignment of error that his convictions are against the manifest weight of the evidence.

**{¶51}** A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. Also, unlike a challenge to the sufficiency of the evidence, a manifest weight challenge raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A finding that a conviction was supported by the manifest weight of the evidence, however, necessarily includes a finding of sufficiency. *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 14, citing *Thompkins* at 388.

**{¶52}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some,

or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶53} Here, Burkes testified that he was jumped, beaten, and robbed by Nakika, which angered Burkes and caused Burkes to construct a plan to jump Nakika in return and get his belongings back. Shortly thereafter, he obtained a gun and a ride to the home where Burkes knew Nakika stayed. The evidence shows that in the early morning of December 4, 2016, Burke charged upstairs to the bedroom, waving his gun, loudly threatening to kill Nakika. When Burkes's sister made him leave because he had a gun, Burkes waited outside for Nakika. And as soon as Nakika made his way downstairs and to the porch, Burkes fired a shot at Nakika, killing him. He then fled the scene. He confessed to the police that he shot his sister's baby's father. Burkes claims that Nakika threatened Burkes and Burkes only had the gun because he feared for his life. He claims that he did not intend to hurt anyone and that he just "snapped." However, the jury discounted Burkes's account of the facts, which it is free to do. And having reviewed the entire record, we cannot say that this is one of the exceptional cases in which the evidence weighs heavily against Burkes's convictions.

{¶54} Burkes's third assignment of error is overruled.

### *Batson* Challenge

{¶55} Burkes contends in his fourth assignment of error that the trial court erred when it denied his challenge to the state's peremptory challenge of Prospective Juror No. 5 pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Burkes argues that the state excused this juror because of his race.

{¶56} In *Batson*, the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges in a

discriminatory manner to exclude potential jurors solely on account of their race. *Id.* at 89; *see also State v. Hernandez*, 63 Ohio St.3d 577, 581, 589 N.E.2d 1310 (1992).

{¶57} A court adjudicates a *Batson* claim in three steps:

First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Batson* at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination.

(Citations omitted.) *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *Hernandez* at 583, following *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶58} In the first step of the analysis, the trial court must "consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." *Batson* at 96-97. In the second step, "'the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), quoting *Hernandez*, 500 U.S. at 360; *see also State v. Gowdy*, 88 Ohio St.3d 387, 392, 727 N.E.2d 579 (2000). And finally, in the third step, "the trial court may not simply accept a proffered race-neutral reason at face value, but the court must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65.

**{¶59}** "'The rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.'" *Id.*, quoting *Miller-El v. Dretke*, 545 U.S. 231, 251-252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The juror may not be excluded if the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge. *Id.*, citing *Miller-El*.

**{¶60}** Here, the state advised the court of its intention to exercise at least one of its peremptory challenges to exclude one of the three African-American jurors:

> I believe we are going to exercise two peremptories if not more, depending on who fills in and who is left, but we have two in mind, one of whom is Juror No. 5.
>
> He is an African-American gentleman. By my count, there are two other African-Americans on the jury at this moment, but he would be the only one I'm seeking to exclude.

Following the state's expressed intent to use its first peremptory challenge to remove prospective Juror No. 5, defense counsel raised a *Batson* challenge, explaining, "Your Honor, you have a young African-American male. The next African-American male is number 19, we may never get to a pattern. We would be put in a difficult if not impossible situation. But obviously our client is an African-American male and if the one is being dismissed, then * * *." The court responded, "I'm aware * * * you are entitled to a jury of your peers, but it does not require a statistical analysis of who is your peer or percentages or anything else." The court concluded that the defense had not established a prima facie case of discrimination and provided the state with an opportunity to respond.

**{¶61}** In response, the state provided numerous race-neutral reasons for removing the juror. The state asserted that the juror was unemployed and it is not clear whether he has held employment "anytime recently" and he "potentially never worked." The state explained that "by having never been employed, we take that as a sign that he's somewhat disconnected from the community in which he lives." The state also noted that Juror No. 5 "thinks that the system targets people," which the state understood to mean that law enforcement targets people for reasons other than guilt, i.e. if the individual has a past conviction. The state expressed concern that this belief could lead to the juror's conclusion that "perhaps the defendant was only targeted by law enforcement because he had this conviction." The state asserted that this belief "bear[s] on his ability to be fair and impartial."

**{¶62}** Additionally, the state asserted that Juror No. 5 was unable to identify any important decisions he has made in his life other than the decision to stay in high school. The prosecutor found Juror No. 5's response "out of line from the rest of the responses from the jurors who had no problems coming up with things where they made important decisions," and he noted that he would not want this murder trial to be this juror's first important decision. The state also offered that Juror No. 5's body language suggested the juror "is less than interested in these proceedings."

**{¶63}** Finally, the state noted, as a basis for its peremptory challenge considerations, its concern that Juror No. 5 had not been forthcoming with certain relevant information:

> I know we had brought it to your attention maybe at a break, that we had reason to believe that [Juror No. 5] had made a police report, had been a victim of crime some years ago.
>
> We found some records pertaining to that and you suggested to us to inquire. I did that without coming right out and asking him about it, gave the panel several chances to talk about their involvement of victims of crimes. He didn't. It

could have been inadvertent; however, that's hard for me to believe given the nature of the crime, shot with a BB gun in the face.

So for some reason he kept that from us, was unwilling to be forthcoming about it

or he wasn't paying attention, either of which I think there should be a record of.

{¶64} The court then reviewed the three-part test of the *Batson* challenge, noting that the record was unclear whether prospective Juror No. 5 was indeed African-American, and found no prima facie indication of racial discrimination. The court further found that even if the first step had been satisfied, the state provided a sufficient race-neutral explanation for utilizing its peremptory challenge, and the court concluded that purposeful racial discrimination (third step) was not present. The court then rejected the defense's *Batson* challenge.

{¶65} After reviewing the record, we cannot say that the trial court's denial of defense counsel's *Batson* challenge was clearly erroneous. The court engaged in the proper inquiry and gave the state an opportunity to provide its reasons for excusing the juror; the prosecutor provided permissible race-neutral explanations for exercising its peremptory challenge; and the court concluded that purposeful discrimination was not present.

{¶66} Burkes's fourth assignment of error is overruled.

Sentence

{¶67} In his final assignment of error, Burkes contends that his sentence is clearly and convincingly not supported by the record and is contrary to law. While acknowledging this court's inability to review a sentence imposed for aggravated murder, Burkes raises the issue with his sentence in order to preserve the issue for further review.

{¶68} R.C. 2953.08(D)(3) provides that "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review

under this section." This court has therefore "consistently recognized that R.C. 2953.08(D)(3) expressly excludes sentences imposed for aggravated murder from appellate review." *State v. Lawson*, 8th Dist. Cuyahoga No. 103699, 2016-Ohio-7607, ¶ 5, citing *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 66 (8th Dist.), citing *State v. White*, 8th Dist. Cuyahoga No. 101576, 2015-Ohio-2387, ¶ 67-68.

**{¶69}** Accordingly, pursuant to R.C. 2953.08(D)(3), we lack statutory authority to review Burkes's sentence for aggravated murder and overrule Burkes's fifth assignment of error.

**{¶70}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR
KEYWORDS:

.